269 P.3d 782

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Matthew HIGA, Defendant–Appellant.**

No. 30546.

Intermediate Court of Appeals of Hawai'i.

Jan. 31, 2012.

violation of Hawaii Revised Statutes (HRS) § 707–701.5 (1993).

Higa was found guilty in a bench trial of throwing 23–month–old Cyrus Belt (the child) to his death on the H1 Freeway from the Miller Street overpass on January 17, 2008. Higa was undisputedly on methamphetamine and amphetamine at the time of the crime. Higa was found competent to stand trial and did not raise the defense of mental disease or defect. Due to the age of his victim, Higa was sentenced to life imprisonment with the possibility of parole, subject to a 15–year mandatory minimum, pursuant to HRS § 706–660.2 (1993).

## I. Background

### A. Retainer of Attorney Randall Oyama

Higa privately retained Randall Oyama (Oyama) shortly after his January 24, 2008 indictment. In February, Higa, then twenty-three years old, signed a general power of attorney authorizing his father, Shelton Higa (Father), to pay Oyama's retainer from the proceeds of a structured settlement.

At a May 7, 2008 status conference, Oyama stated that he may have to withdraw because he was not being paid. He also stated that he was considering filing for a fitness examination of Higa. At a May 27, 2008 status conference, Oyama said he had resolved matters with Father and was still "undecided" as to whether he would file a motion for a mental fitness exam and raising a mental defense.

On June 26, 2008, the circuit court,[2] issued an order purportedly granting Higa's oral motion to appoint examiners to determine Higa's fitness to proceed and penal responsibility, pursuant to HRS Chapter 704. That order was set aside on July 15, 2008, on the grounds that it was "inadvertently filed."

On July 17, 2008, Oyama filed a motion to appoint examiners to determine Higa's fitness for trial and penal responsibility. Four days later, but before the circuit court entered an order appointing the examiners, Higa executed a second power of attorney,

Lila Barbara Kanae, on the briefs, for Defendant–Appellant.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

NAKAMURA, C.J., FUJISE and REIFURTH, JJ.

Opinion of the Court by FUJISE, J.

Defendant–Appellant Matthew Higa (Higa) appeals from the May 5, 2010 judgment of conviction and sentence, entered in the Circuit Court of the First Circuit (circuit court),[1] convicting him of second-degree murder, in

---

1. The Honorable Dexter D. Del Rosario (Judge Del Rosario) presided.

2. The Honorable Michael D. Wilson signed the first order appointing examiners.

revoking the authority granted to Father and "authorizing Mr. Oyama to act on [Higa's] behalf."[3] Oyama did not advise Higa to seek independent legal advice before executing the power of attorney. Under the power of attorney, Oyama received Higa's monthly settlement checks and placed them into a client trust account.

After the changes in Higa's attorney-in-fact, Father sent the circuit court a handwritten letter, dated October 22, 2008, requesting a postponement because Father had "lost all confidence in [Oyama's] abilities to represent [Higa] properly" and was concerned by "Oyama's casual attitude." Father also told the circuit court that he filed a complaint with the Disciplinary Board. In another letter to the court dated November 5, 2008, Father told the court he was still bothered by Oyama's representation.

The court called two status conferences regarding the matter, on November 6, 2008, and December 17, 2008. At one of the hearings, Oyama "indicated there was no longer a problem" because Oyama had power of attorney to handle Higa's finances. The circuit court noted that the matter of Higa's fitness to proceed was still pending and, based on one examiner's opinion that had been submitted, the court questioned whether Higa had the capacity to execute the change in the power of attorney. Oyama told the circuit court that he was going to stipulate to Higa's fitness. The court stated that this raised a potential conflict of interest, because Oyama would have a financial interest in having Higa found fit to proceed, because if Higa were not, he would have been incompetent to execute a power of attorney. The State indicated that it was considering filing a motion to determine whether a conflict existed, and if so, to remove Oyama from representing Higa. To the circuit court's suggestion that Oyama withdraw, Oyama stated that Higa wanted Oyama to continue representing him. The circuit court then suggested "obtaining guidance" from the Office of Disciplinary Counsel (ODC).

In a March 9, 2009 letter to Charles Hite, acting chief disciplinary counsel, Honolulu Prosecutor Peter B. Carlisle told the ODC that the circuit court had requested that the parties obtain a formal advisory opinion. Oyama had an opportunity to review and approve the letter. Carlisle relayed that Oyama proposed two things to remedy the potential conflict: (1) a formal waiver of the conflict of interest and (2) a power of attorney held by a third party.

ODC's response is not in the record. However, the parties proceeded in accordance with Oyama's proposal. Higa signed (1) a power-of-attorney in favor of Ronald Fujiwara (Fujiwara), a licensed attorney, and (2) a declaration waiving any conflict of interest (Waiver Declaration). In the Waiver Declaration, Higa attested that Oyama disclosed the ODC opinion to him. Higa further asserted that Mr. Oyama was his "attorney of choice" and expressed his "full confidence" in him. The Waiver Declaration further reads:

8. Because of the July 21, 2008 Power of Attorney and financial arrangements I had with Mr. Oyama, questions of conflicts of interest were raised regarding:

 (A) Whether I am capable of executing a power of attorney in favor of Mr. Oyama when the issue of my fitness to proceed and penal responsibility had been raised and it was undecided at the time of the execution on July 21, 2008;

 (B) Whether Mr. Oyama's argument as my criminal defense attorney on the issue of my fitness would be at odds with his position that I was capable of executing the Power of Attorney in which he had a direct personal financial interest;

---

3. The exact scope of the powers of attorney granted is unclear. Higa's Waiver Declaration states that he authorized Oyama, in a July 21, 2008 power of attorney, and then attorney Ronald Fujiwara, in an April 9, 2009 power of attorney, "to act on my behalf." To further confuse matters, Higa's waiver claims that on May 22, 2009, he executed a document entitled "Revocation of *Durable* Power of Attorney[,] which revoked the July 21, 2008 *General* Power of Attorney in favor Mr. Oyama." (Emphasis added). The record does not contain copies of any of the three powers of attorney.

(C) Whether because he had unfettered discretion to authorize payment to himself for legal fees, Mr. Oyama's decision regarding my defense would be based on my best interest, or based on the financial affect it may have on him.

. . . .

12. Having a full and complete understanding of the foregoing, I hereby waive any conflict of interest that may have existed or may still exist based upon Mr. Oyama's prior dual role as criminal attorney and holder of my Power of Attorney.

At a June 24, 2009 hearing, after finding Higa competent to proceed, as discussed in more detail below, the court engaged in the following colloquy with Higa regarding the Waiver Declaration.

THE COURT: Okay. The other matter relating to the issue of a conflict-free representation, I've been provided with a declaration from Mr. Higa waiving any possible conflict.

Q. (By the Court) Mr. Higa, have you discussed this issue with your attorney, Mr. Oyama?

A. Yes.

Q. Okay. And I've been provided with what's been entitled Matthew Higa's Declaration of Waiver of Conflict of Interest. Have you reviewed this document?

A. Yes.

Q. Okay. On the last page of this document it appears to have your signature, is this your signature?

A. Yes.

Q. Okay. Did you go over with your lawyer before — did you go over this document with your lawyer before you signed it?

A. Yes, Your Honor.

Q. And did you read and understand it before you signed it?

A. Yes.

Q. Do you have any questions about this?

A. No.

At the request of the State and without objection, the circuit court made Higa's Declaration of Waiver of Conflict of Interest part of the record and found that Higa "made a knowing, intelligent, and voluntary waiver of his right to a conflict-free representation by his execution of this document in open court."

**B. Fitness to Proceed**

On July 27, 2008, the circuit court[4] appointed a three-member panel to examine Higa. The panel determined two-to-one that Higa was competent to stand trial.

Psychiatrist Dr. Martin Blinder (Dr. Blinder), based on a July 10, 2008 psychiatric exam of Higa, diagnosed Higa with a "thought disorder, in part secondary to addiction to stimulant drugs." He noted in a report dated July 25, 2008:

This gentleman exhibits a persistent thought disorder as well as the eccentric affect (emotional tone) characteristic of schizophrenics. Nevertheless, his commerce with reality is sufficient to render him fit to proceed. There is, however, substantial evidence that his mental disability affected his state of mind and criminal intent at the time of his offense.

On August 18, 2008, Dr. Blinder examined Higa again and sent the court an updated report on August 25, 2008. Dr. Blinder observed:

[Higa's] answers to the standard "704 competency" questions was [sic] entirely orthodox. He knew the charges, possible penalties, role of the various court officers, and this time (unlike last time) understood an NGI [(not guilty by reason of insanity)] defense: "It means you weren't in your right state of mind. But that doesn't apply to me. I *was* in my right state of mind. I just didn't commit the crime."

. . . .

[Higa] sees no basis for an NGI defense. Rather, he will stick to his claims of innocence and the fact that no one actually saw him do the deed.

Dr. Blinder wrote, "In summary, though psychiatrically disabled, sometimes confused, and in denial, Mr. Higa is mentally compe-

---

4. Judge Del Rosario entered this order.

tent to proceed. Though his disability played a role in his offense (there is no rational reason for his doing what he did) there is insufficient clinical data to support an insanity defense." Dr. Blinder's report also contained this footnote:

I believe that Mr. Higa's persistent adherence to an improbable scenario may be an example of *confabulation,* wherein the mind creates an alternative scenario to fill gaps in memory caused by a mental disease or a defect. As such, it is distinguished from conscious lying or dissembling. This phenomenon doubtless adds somewhat to defense burdens but does not in itself negate competence.

Psychologist Stephen E. Gainsley (Dr. Gainsley) opined that Higa was fit to proceed. Dr. Gainsley stated he thought Higa "was not substantially impaired as to either cognitive or volitional capacity as a result of mental disease or disorder at the time of the alleged offense[,]" but rather was "experiencing a substance-induced psychotic episode" as a result of methamphetamine use shortly before the incident. Dr. Gainsley noted he did not believe that Higa had a preexisting psychotic disorder, because he had not been previously treated for anything other than substance abuse.

Dr. Dennis R. Donovan (Dr. Donovan), a psychological consultant with the Department of Health, Adult Mental Health Division, Courts & Corrections Branch, opined that Higa was not fit to proceed. Dr. Donovan wrote:

Mr. Higa does have some of the capacities underlying fitness and at first glance he does appear fit, and I think an understandable argument can be made in support of that. He certainly does not appear to be grossly psychotic, disorganized or to have psychomotor agitation or retardation. However, I don't think he is fit to proceed, and I think he likely is mildly psychotic as a residual of his crystal methamphetamine use. . . .

Mr. Higa was well oriented on all occasions. He is aware of the role and function of court personnel and is capable of understanding basic court procedures. He understands the charge and allegations against him, but does not demonstrate an appreciation of the strength of the case against him or his legal jeopardy. He is aware of basic pleas/defenses and their consequences, understanding that a conviction could bring a lengthy jail sentence and that a finding of "not guilty" could bring him freedom. He did not know initially and did not seem to care to learn the nature and possible consequences of an insanity defense, showing little interest in it, with his only query involving whether or not he would be allowed to smoke at the Hawaii State Hospital if he were to go there.

. . . .

. . . He does not seem to appreciate his legal jeopardy and seems comfortable in the idea that he will (magically) be found not guilty. He indicates [he] would not consider a plea bargain, even in a hypothetical situation I presented to him where it likely would be in his best interest to take a plea bargain. He wants to go to trial immediately so that he can win and be released immediately.

. . . Mr. Higa denies the charge, denies mental illness and does not want the insanity defense to be considered.

During the June 24, 2009 hearing, Higa stipulated to his fitness for trial. Based on the stipulation and the panel's reports, the circuit court concluded that Higa was fit to stand trial.

Higa filed a trial memorandum on November 30, 2009. At the December 10, 2009 hearing on the State's motions in limine, the court instructed Oyama to file responsive memoranda to the State's motions in limine regarding, inter alia, the voluntariness of the statements Higa made to police and medical personnel, stating that the court "wanted to treat this [instruction] as a—perhaps an education as well as an admonishment to make a better appellate record." Then, the following interaction took place:

THE COURT: Okay. One other point I wanted to raise is that earlier we had talked about trial memorandums, in particular the defense theories. The state had submitted a trial memorandum. Mr. Oya-

ma, have you—are you going to file a trial memorandum as to your legal theory of the case?

MR. OYAMA: I did file a trial memorandum.

MR. CARLISLE: He did. Does the Court not have a copy of it?

THE COURT: I was looking for it and I wasn't able to locate it.

MR. CARLISLE: It definitely, definitely exists.

THE COURT: Anything else at this time?

In response to this interaction, on January 19, 2010, Higa filed a "Motion to Disqualify the Presiding Judge." The motion was based upon HRS § 601–7 and the Hawai'i Revised Code of Judicial Conduct. Attached to the motion was an affidavit by Oyama, but no affidavit from Higa himself. Oyama's affidavit states in relevant part: [5]

2. In the early stages of the Higa case, Judge Del Rosario informed [Oyama] that he should withdraw from the case. Judge Del Rosario stated his belief that a conflict of interest existed between [Oyama] and [Higa]. [Oyama] did not believe that a fatal conflict existed.

3. [Oyama] did not withdraw as suggested by Judge Del Rosario. Therefore, to satisfy Judge Del Rosario, the matter was brought before the Office of Disciplinary Counsel to render an advisory opinion regarding the conflict that Judge Del Rosario claimed existed.

4. In the Higa case, Judge Del Rosario requested that the parties prepare and submit trial memorandum by November 30, 2009.

5. On November 30, 2009, [Oyama] filed Defendant Matthew Higa's Trial Memorandum. (See attached Exhibit "A").

. . . .

7. On December 9, 2009, after the completion of the scheduled Motion in Limine, Judge Del Rosario, in open court with the media present, announced that he had asked counsel to prepare trial memorandum. Judge Del Rosario then pointed out that he had received the State's trial memorandum. Finally, Judge Del Rosario pointed out that he did not receive a trial memorandum from [Oyama].

[Oyama] responded by telling Judge Del Rosario that he had in fact filed a trial memorandum as requested. Upon hearing [Oyama's] response, Judge Del Rosario glared at [Oyama] with a look of disbelief. Following a brief period of uncomfortable silence, the State's attorney, Peter Carlisle, confirmed [Oyama's] contention that the trial memorandum had been filed. Upon learning this fact, Judge Del Rosario indicated that he would review it later and left the courtroom.

. . . .

21. [Oyama] believes that Judge Del Rosario has demonstrated bias and/or prejudice towards [Oyama] based upon the following:

a. Intentionally humiliating [Oyama] in open court with media present subsequent to completion of the scheduled court activity for December 9, 2009, by falsely accusing [Oyama] of non-performance in submitting trial memorandum. Intentional humiliation demonstrates bias and prejudice.

The circuit court held a hearing on the motion to disqualify on January 20, 2010. The parties offered no oral argument on the motion. Prior to announcing its decision, the circuit court outlined the law on judicial disqualification under statute and the common law "appearance of impropriety" standard. The circuit court stated that, as there was no affidavit from Higa as required by the statute, it need only consider the appearance of impropriety part of the analysis. The circuit court, addressing paragraphs 2 and 3 of Oyama's affidavit, stated that it believed that Oyama's "representations are not entirely accurate" regarding how the ODC opinion came about. The circuit court explained:

---

**5.** Oyama's affidavit included a great deal of information about the criminal case of *State v. Ryan Kawamoto*, Cr. 09–1–1632, that has no readily apparent connection to Higa other than Oyama's representation of both men at the same time in cases presided over by Judge Del Rosario.

The court indicated that perhaps this is a matter that we can obtain guidance from the Office of Disciplinary Counsel, and perhaps based on their guidance, it could also satisfy the State's concern regarding any possible appellate issue. For that reason, we had continued the matter further for both the prosecution and Mr. Oyama to work on the communication to the Disciplinary Counsel laying out the facts and circumstances that arose and to give some type of informal opinion as to the course of action to take, both to protect Mr. Higa, the defendant, protect Mr. Oyama as his counsel, as well as to protect the State's interest.

Later, the circuit court characterized this not as a "referral" but rather "advice to the attorneys to get an informal opinion from the Disciplinary Counsel."

To Oyama's allegation that the court had "intentionally humiliated" Oyama in front of the media by inferring that Oyama did not file a trial memorandum, Judge Del Rosario explained that the court did not receive the customary "courtesy copy" and Oyama's memorandum was not in the judge's folder at the hearing. As the circumstances surrounding the court's questioning of Oyama about the memorandum was on the record, the court would say only that the record "speaks for itself."

Higa objects on appeal to the following findings of fact[6] and conclusions of law, which the circuit court entered February 10, 2010, after trial:

21. With respect to the conflict of interest issue, the Court notes that it did not make any referrals to the Office of Disciplinary Counsel in this case regarding improper conduct, but an inquiry was made by counsel.

. . . .

33. Mr. Oyama indicated his client wanted him to continue representing him and that he wanted to remain on the case. The Court therefore suggested obtaining guidance from the Office of Disciplinary Counsel (ODC) and the attorneys agreed to work on a letter to ODC laying out the facts and circumstances that had arisen to date in order to obtain an opinion as to a course of action that would protect Defendant, Mr. Oyama and the State's interest.

. . . .

35. As a result of the letter to ODC, independent counsel was retained by Mr. Higa to manage his financial interests and to advise him on the potential conflict of interest. Mr. Higa elected to waive any conflict at a hearing held June 24, 2009.

. . . .

40. The circumstances related above arose as part of the Higa case and the Court was required to deal with them. The Court unequivocally has no bias or prejudice against Mr. Oyama or Defendant Higa, nor is the Court disposed in favor of the state.

. . . .

42. In consideration of the records as a whole in both *State of Hawai'i vs. Ryan Kawamoto*, Cr. No. 09–1–1632 and *State of Hawai'i vs. Matthew Higa*, Cr. No. 08–1–0132, the Court finds the Affidavit of Randy Oyama has not objectively established that the Court has a bias or prejudice against Mr. Oyama or in favor of the State such that Mr. Kawamoto and Mr. Higa cannot obtain a fair trial.

The circuit court concluded that, when the facts and circumstances were viewed objectively, Judge Del Rosario did not appear to demonstrate bias, lack of partiality, or competence and therefore Higa had failed to meet his burden of establishing a basis to disqualify Judge Del Rosario.

### C. Trial testimony

The parties do not dispute most of the events leading up to the child's death. The following testimony is relevant to Higa's contention on appeal that the child died before Higa threw him from the overpass.

#### 1. Appearance of the child by lay observers

Kraig Hengst (Hengst), who lived across the street from the Miller Street overpass, testified that he and a roommate were in the

---

6. Higa also objects to findings 17 and 18, which deal with the Kawamoto case.

apartment's ground-floor garage around 11:30 to 11:40 a.m. on January 17, 2008. Hengst saw a man in green medical scrubs walking a "little hunched over" on the overpass. The man was alone. When Hengst looked up, Hengst saw the man throw, in an arcing motion over the overpass railing, what Hengst thought to be a doll, by its arm. The doll-like object made a "cartwheel motion spinning in the air" with the arms extended directly to the side, legs a shoulder width apart. It cartwheeled about one and a half spins, before it dropped out of Hengst's sight. Hengst said he could not recall hearing crying or seeing a struggle. After a moment, Hengst and his roommate walked to the overpass, as the man, whom Hengst identified as Higa, walked about two to three car lengths away from them in the Diamond Head direction, smoking a cigarette and occasionally looking back at them. It was only after Hengst looked onto the highway that he realized the object was a child.

Hansen "Sonny" Kiaha (Kiaha) was driving a delivery truck westbound on the H1, traveling about forty miles per hour, when he saw something that looked like "a child doll coming in front of the truck." Kiaha's passenger Jimmy Aliven (Aliven) yelled, "Uncle, it's a baby." Kiaha felt a thump and then heard a loud pop. Kiaha had "no chance" to avoid hitting the object. He pulled the truck to the side of the road, and ran into the highway where the men saw it was a child's body on the pavement.

Aliven testified through a translator that he believed the child was already dead when it was falling because "there was no movement at all," the child made no sound as it fell, and "when we hit the baby, there was no more blood coming out."

Mary Susan Arnold, a nurse who was driving a car behind Kiaha's truck, pulled over and ran to what she thought was "a doll" in the road. She looked up and saw a man on the overpass. Turning her attention to the child, she saw there was "nothing I could do." She held his hand, which was "warm," and covered him with a blanket.

### 2. Medical experts' testimony and physical evidence

Dr. Gayle F. Suzuki (Dr. Suzuki) performed the autopsy on the child. At the time, she was the medical examiner for the City & County of Honolulu and a board certified forensic pathologist. Dr. Suzuki opined the cause and manner of the child's death was "multiple injuries due to fall from a height, and it was homicide." She summarized the child's injuries as follows:

[H]e had extensive head injuries with the skull being crushed and opened up with the brain being avulsed or traumatically removed from the head.

He had all of those road rash or brush abrasions on the surface of his body, and internally, even though the skin is pretty much in tact [sic] on the outside, but internally there was so much damage to the organs itself; injuries to the lungs were bruised and it was torn.

He had a torn kidney. The aorta was also torn, and a lot of bruising. That liver was bruising, with a lot of tearing or injury of the—of the liver itself.

So these are really severe type of injuries that is consistent with him being run over by a motor vehicle. These are the crush type injuries that result in—I mean, it's really severe.

The child also had a fractured collar bone.

Dr. Suzuki ruled out the possibility that the child was suffocated or strangled, because he did not have injuries to his mouth, nose, or eye lids that would indicate as much. A toxicology screen showed that there were no drugs or alcohol in the child's body.

Dr. Suzuki testified that the child's body had "extensive bruising" in the organs and tissue of the chest and abdominal area, which indicated that his heart was pumping and blood was flowing throughout his body at the time the injuries occurred. She said:

[I]f he had already died prior to being thrown over, then, you know, there can be some blood, but not hemorrhaging or bleeding into the tissues itself, or this much of a bruise.... [Y]ou don't get this much bleeding if the person is already dead.... You can get some seepage of

blood that's still in the capillaries, but there's no bleeding into the tissues itself. (paragraph formatting altered).

Dr. Suzuki also opined that the child spinning in a cartwheel motion supported the notion he was alive when thrown as it would take muscle control to maintain that position. By contrast, a dead child's limbs would be "floppy."

On cross-examination, Dr. Suzuki agreed that the damage to the brain and skull made it impossible to rule out a subdural hemorrhage, a sign of shaken baby syndrome, or a skull fracture prior to the fall. She, however, countered that it was "really, really, really unlikely" that the child had suffered shaken baby syndrome because of the child's age.

For its part, the defense presented the testimony of Dr. James Navin (Dr. Navin). Dr. Navin testified that, based on the witnesses' statements to police, his opinion was that the child was unconscious or dead at the time he was dropped from the overpass. He opined:

[T]he description of the child being thrown through the air with arms and legs extended and not moving. And you ever take the kids to the beach and throw them up in the air, they don't do that. They don't just not move.... They clutch out. They have a righting reflex[.]

Dr. Navin said he also read the autopsy report and found it "problematic" that a one-inch long laceration on the child's face was "so clean," meaning there was no blood around it, which suggested to him that the child was already dead when he sustained the laceration. However, Dr. Navin also said that a "sudden instant death" may result in not much bleeding "so there's nothing absolute about it."

Consistent with Dr. Suzuki's testimony, Dr. Navin said it was impossible to rule out a

traumatic brain injury prior to the fall, due to the extent of the damage to the child's skull and brain.

Dr. Navin opined that Dr. Suzuki's conclusion that the presence of massive internal bruising proves that he was living prior to the fall was "not valid." Citing to a forensic pathology textbook, Dr. Navin said that a post-mortem injury "can cause movement of blood in small channels for at least 20 minutes after cessation of cardiac activity." As a result, the extensive bruising did "not necessarily" indicate that the child was alive before the fall.

Dr. Navin also said that he described to about eight other physicians how the child's body appeared as it went through the air and their "almost universal response was, He's [sic] out of it, either dead or unconscious." Dr. Navin could not rule out the possibility that the child was merely unconscious and not dead.

### 3. Statements to police[7]

William Daubner, the Honolulu Police Department (HPD) officer (Ofr. Daubner) who arrested Higa, testified that at the time of the arrest, Higa was sweating profusely and was rocking back and forth. Higa told Ofr. Daubner that he smoked ice a day-and-a-half earlier, that a Latino lady with a blue scarf handed him the baby and he threw it, and he said thank you for everything. HPD Officer Kevin Ching (Ofr. Ching), who arrived after Ofr. Daubner arrested Higa, testified that as Higa was being handcuffed, he said, "I didn't mean to do it."

HPD Detectives Kenneth Higa (Det. Higa) and Sheryl Sunia (Det. Sunia) questioned Higa at 7:30 p.m. on January 18, 2008, after he had been in custody for more than a day. Higa told them that he was walking on the

7. At a hearing on the State's motion to determine the voluntariness of Higa's statements made to police, Oyama orally objected to the State's motion. The circuit court ordered Oyama to submit written pleadings with his position in opposition. After being read HPD Form 81, "Warning Persons Being Interrogated of their Constitutional Rights," Higa stated that he did not want to have an attorney present and signed the form. The circuit court held the statement made under in-

terrogation was admissible, given that Higa was "lucid and able to engage in conversation intelligently and articulate his thoughts and feelings and that his statements were voluntarily given and uncoerced" and that the detectives had given Higa the warnings required by *Miranda*. The circuit court also held that the statements that Higa made to police on January 17, 2008, were made knowingly, intelligently, and voluntarily.

overpass towards Queen's Medical Center to see his sister, when a lady with dark brown or black hair ran toward him, saying her "boyfriend's going to kill 'em." Higa said:

She has a carriage, and she ... puts the baby in my hands. And I all—I didn't know what to do, right because I was on.... And she told me to kill my baby before my husband comes and kills it.

. . . .

And then I don't know she—she guides my hand, and then the baby fell over. She put the baby in my hands, and she pushed—like pushed my hands, and the baby fell over.

Higa told the detectives that the baby was crying, moving its arms and legs. Higa admitted that he had done "one hit" the morning before and that he smoked ice "frequently," every day or twice a week for the past two years.

On appeal, Higa challenges the sufficiency of the evidence in support of his conviction, the failure of the circuit court to recuse itself due to bias against his counsel, the finding that he waived the right to conflict-free counsel, and claims for the first time that his trial counsel was ineffective.

## II. Discussion

### A. Evidence was sufficient to prove that the child was alive when Higa threw him off the overpass.

█ In this appeal, Higa challenges the sufficiency of the evidence presented at trial. [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed.

"Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence.

*State v. Matavale*, 115 Hawai'i 149, 157–58, 166 P.3d 322, 330–31 (2007) (brackets omitted) (quoting *State v. Batson*, 73 Haw. 236, 248–49, 831 P.2d 924, 931 (1992)). His argument on appeal hinges on conflicts in testimony offered by the medical experts Dr. Suzuki and Dr. Navin. However, in view of the trial judge's responsibilities as a finder of fact during a bench trial, Dr. Suzuki's testimony is sufficient, probative evidence, when viewed in the strongest light for the prosecution, that the child was alive when Higa threw him from the overpass.

Higa contends that Dr. Suzuki's analysis was based on "incomplete information," because Det. Higa had not told Dr. Suzuki of testimony from witnesses regarding the description of the body as it fell. However, Dr. Suzuki testified that she did not base her cause-of-death conclusion upon the witnesses' descriptions, but upon the autopsy results. For instance, upon cross-examination, she stated that although the description of the child making a cartwheel was "consistent with him being alive[,]" she did not "need that information in order to conclude that he was alive."

█ The trier of fact has the responsibility of reconciling conflicting evidence. *See State v. Kikuta*, 125 Hawai'i 78, 94, 253 P.3d 639, 655 (2011) (citing *State v. Gabrillo*, 10 Haw.App. 448, 457, 877 P.2d 891, 895 (1994)). "Expert testimony is not conclusive and like any testimony, the jury [or fact-finder] may accept or reject it." *Bachran v. Morishige*, 52 Haw. 61, 67, 469 P.2d 808, 812 (1970). Based on the differences in Dr. Suzuki's and Dr. Navin's experience in conducting autopsies and their respective backgrounds in forensic medicine, the circuit court may have considered Dr. Suzuki's opinion to be more

credible. Furthermore, Dr. Navin's opinion is based upon eyewitness descriptions, rather than the physical evidence of the child's body, upon which Dr. Suzuki based her opinion. Resolving the conflicts in testimony in favor of the State, there was sufficient evidence based on Dr. Suzuki's testimony that the child was alive when Higa threw him and that the impact with the pavement and truck, both direct results of being thrown, caused the child's death.

In addition to Dr. Suzuki's testimony, the State presented evidence that the child had been seen alive by HPD Officer Darryl Jones (Ofr. Jones) at about 11:15 a.m., which was only about twenty minutes before Hengst saw Higa throw the child off the overpass. The State also introduced evidence that Higa told detectives that the child had been crying and moving his arms and legs. Such evidence constitutes additional, corroborating evidence that the child was alive when Higa threw him off the overpass and that Higa was responsible for causing the child's death.

Moreover, Hengst's testimony regarding Higa's physical actions, lifting the child over the protective guard rail, is sufficient evidence that Higa intentionally acted to cause the child's death. Accordingly, there is substantial evidence of every element of the crime for which Higa was convicted.

## B. The circuit court did not err by denying Higa's motion to disqualify itself.

Higa's second argument is that the circuit court erred in denying his January 19, 2010 motion to disqualify the trial judge.[8] "Decisions on recusal or disqualification present perhaps the ultimate test of judicial discretion and should thus lie undisturbed ab-

sent a showing of abuse of that discretion." *TSA Int'l Ltd. v. Shimizu Corp.*, 92 Hawai'i 243, 252, 990 P.2d 713, 722 (1999) (quoting *State v. Ross*, 89 Hawai'i 371, 375, 974 P.2d 11, 15 (1998)).

Higa's memorandum in support of his motion recited the standards for disqualifying a judge under HRS § 601-7 and under the "appearance of impropriety" standard outlined in *State v. Ross*, 89 Hawai'i 371, 974 P.2d 11 (1998), but did not explain how the facts of his case required recusal under either standard. On appeal, Higa abandons the argument that disqualification was appropriate under HRS § 601-7, but maintains that disqualification was warranted under *Ross* and *Office of Disciplinary Counsel v. Au*, 107 Hawai'i 327, 338, 113 P.3d 203, 214 (2005) (quoting *Ross*, 89 Hawai'i at 380, 974 P.2d at 20).

*Ross* provides that where a judge's alleged bias does not fall within the statutory grounds for disqualification, "the court may then turn, if appropriate, to the notions of due process described in *Brown*, in conducting the broader inquiry of whether 'circumstances ... fairly give rise to an appearance of impropriety and ... reasonably cast suspicion on [the judge's] impartiality.'" *Ross*, 89 Hawai'i at 377, 974 P.2d at 17 (quoting *State v. Brown*, 70 Haw. 459, 467 n. 3, 776 P.2d 1182, 1188 n. 3 (1989).[9] In *Brown*, the Hawai'i Supreme Court overturned a criminal contempt conviction entered by the judge who cited the defendant, citing the maxim that "justice must satisfy the appearance of justice." 70 Haw. at 467, 776 P.2d at 1188 (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954) (internal quotation marks omitted)). "[T]he test for

8. In connection with this point on appeal, Higa challenges Findings of Fact (FOF) 17, 18, 21, 33, 35, 40, and 42 and Conclusions of Law (COL) 9, 11, and 13. He does not, however, provide argument supporting his position that FOF 17, 18, and 35 were erroneous, and furthermore states in his Reply brief that he "is not attempting to dispute the correctness of many of the lower court's findings in this regard." We therefore deem his challenge to these FOF abandoned. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7); *Hawaii Ventures, LLC v. Otaka,*

*Inc.*, 114 Hawai'i 438, 478–79, 164 P.3d 696, 736–37 (2007).

9. *Ross* was based on the 1992 Code of Judicial Conduct (CJC), which was replaced in its entirety in 2008 by the Revised Code of Judicial Conduct (RCJC); *State v. Mata*, 71 Haw. 319, 789 P.2d 1122 (1990) and *Brown* were based on the 1988 Code of Judicial Conduct. However, the canons cited in *Ross*, *Mata*, and *Brown* have counterparts in the current Revised Code. *Compare* CJC Canon 3C (1988), *with* CJC Canon 3E (1992), *and* RCJC Rule 2.11 (2008).

disqualification due to the 'appearance of impropriety' is an objective one, based not on the beliefs of the petitioner or the judge, but on the assessment of a reasonable impartial onlooker apprised of all the facts." *Ross*, 89 Hawai'i at 380, 974 P.2d at 20.

■ On appeal, Higa cites four reasons to doubt the court's impartiality: (1) "the court's inability to acknowledge that the opinion of the ODC was obtained 'at its direction,'" (2) "its repeated interference with defense counsel's continuing with the case;" (3) its "obvious displeasure with defense counsel" and (4) the holding of numerous chambers conferences. We conclude that there was no appearance of impropriety in this case, and accordingly the circuit court judge did not abuse its discretion in refusing to disqualify himself.

To the first complaint, Higa admits that under *State v. Mata*, 71 Haw. at 324, 789 P.2d at 1125, there would be no impropriety if the circuit court had indeed referred Oyama to the ODC. Yet, Higa contends that the court "in effect denied having done exactly that" and the denial must be presumed was done to avoid the appearance of impropriety. Higa is quibbling over semantics. Higa does not claim that the circuit court itself initiated a complaint with ODC. It is to the initiation of a complaint that the term "referral" applies. *See Mata*, 71 Haw. at 324, 789 P.2d at 1125 (using the word "refer" and "referral" to mean the process of initiating appropriate disciplinary measures, and in particular, reporting the attorney in question to ODC for professional conduct violations). Finding of Fact number 21 (FOF 21), stating that the court did not make any "referrals" to the ODC, is consistent with *Mata*'s use of the word "referral."

To the extent that we read Higa's briefs to argue that the circuit court must be biased because it would not acknowledge that it ordered or directed the parties to get an ODC opinion on Oyama's situation, Higa failed to produce transcripts that indicate such an order or "direction" was made. The circuit court's ruling characterized its position as "advice to the attorneys to get an informal opinion from the Disciplinary Counsel." There is nothing in the record before

us that indicates otherwise. Because the appellant "carries the burden of demonstrating the alleged error *in the record*," *State v. Hoang*, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000), we do not find that the circuit court's FOF 21, which states "it did not make any referrals to the Office of Disciplinary Counsel," to be clearly erroneous. Given that Higa's first allegation of the circuit court's apparent partiality is premised on FOF 21 being clearly erroneous, Higa fails to prove error based on the circuit court's "inability to acknowledge that the opinion of the ODC was obtained 'at its direction.'"

Higa further states that the circuit court's lack of impartiality is evidenced by "its repeated interference with defense counsel's continuing with the case." As his single example of the court's interference, Higa cites to Carlisle's letter to the ODC. We do not construe the rest of Higa's argument as an objection to the court refusing to further relevant court dates, as Higa has not pointed to any continuances requested but denied. Rather, we read Higa's argument as a challenge to the circuit court's suggestion that Oyama should have withdrawn from representation.

■ Trial courts have an independent duty of ensuring a fair trial. *Wheat v. United States*, 486 U.S. 153, 161, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (citing *Glasser v. United States*, 315 U.S. 60, 62, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). This duty includes the duty to inquire into a conflict of interest where the probable risk of conflict has been raised, *see Holloway v. Arkansas*, 435 U.S. 475, 483–84, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), or where "the trial court knows or reasonably should know that a particular conflict exists." *See Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Even where, as here, a defendant has waived his or her right to conflict-free counsel, the trial courts have substantial latitude in accepting or denying that waiver. *Wheat*, 486 U.S. at 163, 108 S.Ct. 1692. Assuming, arguendo, that the waiver was valid, the circuit court had the power to refuse to accept it and could have removed Oyama as counsel. Given that Oyama continued to serve as trial counsel, the circuit court cannot

be fairly accused of interfering with Oyama's "continuing with the case."

Higa's complaint regarding the circuit court's "obvious displeasure with defense counsel" is unclear. Higa cites to Oyama's affidavit in support of the motion to disqualify, which states that after Oyama told the court that he had filed a trial memorandum, Judge Del Rosario "glared at [Oyama] with a look of disbelief" and that after "a brief period of uncomfortable silence," the prosecutor confirmed that the memorandum had been filed. If the circuit court gave Oyama any incredulous looks or the court room was uncomfortably silent, the transcript does not convey that, nor do we expect that it would. *See Alt v. Krueger,* 4 Haw.App. 201, 209, 663 P.2d 1078, 1083 (1983) ("we appreciate that the cold written word can never adequately convey to the reader such things as facial expression, 'body language,' and the general climate in which things are said"). But even if such expressions did occur, it is unclear that expressions rise to the level of impropriety necessary for disqualification. *See* David E. Rigney, Annotation, *Gestures, Facial Expressions, or Other Nonverbal Communication of Trial Judge in Criminal Case as Ground for Relief,* 45 A.L.R. 5th 531 (1997) (collecting cases where a judge's nonverbal communication was and was not prejudicial error, specifically in jury trials). *Cf. Rollins v. Massanari,* 261 F.3d 853, 858 (9th Cir.2001) (quoting *Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("expressions of impatience, dissatisfaction, annoyance, and even anger ... do not establish bias") (internal quotation marks omitted) (applying an "actual bias" standard for recusal of federal administrative law judge).

Higa also argues that there was an appearance of impropriety where the court held "numerous chambers conferences." Rule 77 of the Hawai'i Rules of Civil Procedure (HRCP) provides that, except for trials upon the merits, "[a]ll other acts or proceedings may be done or conducted by a judge in chambers, without the attendance of the clerk or other court officials and at any place either within or without the circuit[.]" To the extent that Higa complains that the court discussed the case with counsel in chambers, the argument is without merit.

## C. Counsel's performance was not ineffective.

Higa's third and fourth points of error involve overlapping challenges to the conduct of his trial attorney. In his third point, Higa challenges his purported waiver of a conflict of interest on the part of his counsel, Oyama. In his fourth point, Higa argues that his counsel's representation was ineffective for a number of reasons, including his counsel's alleged conflict of interest.

■ The record makes clear that Oyama was Higa's counsel of choice. The right to privately retained counsel of one's choosing is guaranteed by both the Hawai'i and United States Constitutions. *Wheat,* 486 U.S. at 159, 108 S.Ct. 1692; *State v. Maddagan,* 95 Hawai'i 177, 180, 19 P.3d 1289, 1292 (2001). However, this right is not absolute and "can be outweighed by countervailing governmental interests." *Maddagan,* 95 Hawai'i at 180, 19 P.3d at 1292 (quoting *United States v. Monsanto,* 836 F.2d 74, 80 (2d Cir.1987)). In other words, "in the absence of countervailing considerations, a criminal defendant should have his, her, or its choice of retained counsel." *Id.*

■ A defendant's right to counsel of his choice may be complicated by the corresponding right to conflict-free counsel, a right which "inheres in the right to counsel guaranteed by the federal constitution and our state constitution." *Fragiao v. State,* 95 Hawai'i 9, 17, 18 P.3d 871, 879 (2001) (internal citation omitted). *See also State v. Pitt,* 77 Hawai'i 374, 378, 884 P.2d 1150, 1154 (App.1994) (quoting *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981)) (The right to counsel "encompasses the 'correlative right to representation that is free from conflicts of interest[.]' "), *overruled on other grounds by State v. Richie,* 88 Hawai'i 19, 44, 960 P.2d 1227, 1252 (1998), *as recognized by State v. Mark,* 123 Hawai'i 205, 244, 231 P.3d 478, 517 (2010).

■ Another component of the right to counsel is the right to effective assistance of counsel. In analyzing an ineffective assis-

tance of counsel claim, the appellate court considers whether counsel acted "within the range of competence demanded of attorneys in criminal cases." *State v. Wakisaka,* 102 Hawai'i 504, 514, 78 P.3d 317, 327 (2003). However, it is the defendant's burden to show counsel was ineffective under a two-part test:

> 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. To satisfy this second prong, the defendant needs to show a possible impairment, rather than a probable impairment, of a potentially meritorious defense. A defendant need not prove actual prejudice.

*Id.* at 514, 78 P.3d at 327 (footnote and citation omitted) (quoting *State v. Aplaca,* 74 Haw. 54, 66–67, 837 P.2d 1298, 1305 (1992)). We now turn to Higa's specific claims.

### 1. Oyama's alleged conflict of interest was resolved before it rose to the level of ineffectiveness.

■ Higa's first challenge to Oyama's effectiveness is predicated on the alleged conflict of interests between Oyama and Higa. *Ritchie* and *Mark* teach us that "representation is constitutionally ineffective where there exists '(1) a relationship giving rise to a conflict of interest ... between defense counsel and his/her clients; and (2) *either* the relationship adversely affected defense counsel's performance, *or* the client did not consent to the relationship." *Mark,* 123 Hawai'i at 241, 231 P.3d at 514 (emphasis in original); *Richie,* 88 Hawai'i at 44, 960 P.2d at 1252.

Thus, the first inquiry is whether an actual conflict existed. At the time Higa entered his waiver, there was no actual conflict between his interests and Oyama's. "To determine whether a relationship giving rise to a conflict of interest existed, we turn to the [Hawai'i Rules of Professional Conduct (HRPC)] for guidance." *Fragiao,* 95 Hawai'i at 18, 18 P.3d at 880 ("Satisfaction of the first prong of the *Richie* test depends on whether the relevant HRPC provisions would

prohibit [the attorney] from representing [the client].")

Rule 1.7(b) of the HRPC prohibits a lawyer from representing a client "if the representation of that client may be materially limited ... by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation." Comment 4 to Rule 1.7 emphasizes that an attorney's duty of loyalty is impaired "when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests."

■ Higa's ineffectiveness claim apparently assumes that Oyama's representation was "materially limited" because Oyama could not pursue a challenge to Higa's fitness to proceed without also calling into question the validity of the power of attorney Higa had given him. However, such an assumption is unwarranted. Oyama already moved for expert examination of Higa's fitness to proceed and penal responsibility four days before Higa executed the power of attorney in Oyama's favor. Thus, to the extent Oyama sought the power of attorney, it did not limit his representation because it did not prevent him from also initiating an investigation of Higa's fitness to proceed and capacity to commit the charged offense.

More importantly, two months before any decision was made on Higa's fitness to proceed, Oyama himself suggested that a superceding power of attorney be executed in favor of an attorney unconnected to this case. The record indicates this was done. Thus, by the time Oyama stipulated to Higa's fitness to proceed, he no longer held the power of attorney and thus it could not have materially limited his representation.

This temporal analysis has been employed in the context of conflicts due to multiple or successive representation. In *Richie,* the Hawai'i Supreme Court noted that, although defense counsel represented both Richie and Alves (in a civil matter), by the time Richie went to trial, Alves was no longer a co-defendant and although Alves was a potential witness against Richie, Alves was never called as an actual witness against him. *Ri-*

*chie,* 88 Hawai'i at 44, 960 P.2d at 1252; *see State v. Mark,* 123 Hawai'i at 239–40, 231 P.3d at 512–13 (noting *Richie's* use of a temporal analysis in determining whether a conflict of interest existed). Along with the fact that Richie was represented by two attorneys, only one of which also represented Alves, the *Richie* court concluded that "trial counsel's relationship with his clients was [not] sufficient to give rise to a conflict of interest." *Id.*

Here, a consideration of all the circumstances convince us that Oyama did not have an actual conflict of interest. We note that Higa agrees that Oyama was retained with a deposit of $10,000, the balance of the retainer to be paid with funds from a structured settlement owed to Higa and that "efforts were undertaken to convert the structured settlement into a lump sum to pay off the balance of the retainer." Thus, the record supports the notion that Oyama was hired to provide Higa legal services and that these settlement funds were to go to Oyama, in payment for his legal services. Even if Oyama was not given the power of attorney, he would have been able to make a claim against Higa's assets, including the structured settlement payments, to collect his fee for services rendered. The execution of the power of attorney in Oyama's favor was merely a means by which he could collect his retainer until the lump sum payment was secured or in the event the lump sum payment could not be secured.

Shortly before this power of attorney was executed, Oyama moved for the appointment of examiners to examine Higa for fitness and penal responsibility. The circuit court granted the motion a week later, staying the proceedings in the case while the examinations could be conducted. By the time the hearing to determine Higa's fitness to proceed was held, the power of attorney executed in favor of Oyama was superceded by one in favor of an attorney uninvolved in this case.

Finally, the record indicates that Higa never wanted Oyama to assert a mental defense. Higa told at least two of the psychiatric examiners, Drs. Blinder and Donovan, a year before the stipulation, that he did not want to raise an insanity defense [10] and wanted to proceed to trial and demonstrate his innocence, which could not happen if he was deemed unfit to stand trial. Two of the examiners, Drs. Blinder and Gainsley, found Higa fit to proceed.

Given that the power of attorney was merely the means to accomplish what Higa had already agreed to do—pay Oyama for his legal services—that Oyama did set in motion the process to determine Higa's fitness to proceed before he was given the power of attorney and did not have the power of attorney by the time the hearing on Higa's fitness was held, that Higa does not challenge on appeal Oyama's stipulation to fitness, or otherwise challenge the circuit court's determination that he was competent to stand trial, and that Higa had long expressed the belief that he did not commit the crime and wanted to go to trial to prove his innocence, Higa's argument that Oyama holding Higa's power of attorney when Higa's mental state was at issue rendered his representation ineffective is without merit. Finally, as Oyama did not have an actual conflict of interest, we need not decide whether the waiver of that conflict was valid.

**2. Trial counsel's failure to use grand jury testimony and decision to call child's mother as a witness at trial will not be second-guessed on review.**

■ Oyama's second alleged omission was the failure to elicit at trial the evidence before the grand jury that (1) the child's arms were "sort of dangling" or "limp" and (2) that there were as many as twenty minutes between when the baby was last seen alive and when Higa was seen on the bridge.

---

**10.** Admittedly, there is a difference between fitness to proceed, as defined by HRS § 704–403 (1993), and penal responsibility, meaning the defendant is "not responsible ... as a result of physical or mental disease, disorder, or defect[,]" under HRS § 704–400 (1993). We can infer from Higa's comments regarding the insanity defense that he did not want to rely on his mental state for either purpose.

Appellate counsel does not provide a citation to the grand jury testimony which she claims was necessary. A review of the grand jury transcripts indicates that the first testimony in question may have come from Kraig Hengst. The defense cross-examined Hengst at trial, but did not ask Hengst about the "limp" comment. Hengst affirmed that he believed the child was a toy doll, and that he changed his opinion only after he looked over the overpass railing and saw the child's body on the highway. Hengst agreed on cross-examination that "a toy doll is a lifeless object." Although it was within Oyama's prerogative to impeach Hengst with the prior inconsistent statement, *see* Hawai'i Rules of Evidence Rule 802.1(1), it is apparent that Oyama chose not to press Hengst about the differences between his grand jury and trial testimony.

In *Richie*, the Hawai'i Supreme Court observed, as it has many times before, that "[t]he decision whether to call witnesses in a criminal trial is normally a matter within the judgment of counsel and, accordingly, will rarely be second-guessed by judicial hindsight." 88 Hawai'i at 40, 960 P.2d at 1248 (quoting *Aplaca*, 74 Haw. at 70, 837 P.2d at 1307) (internal quotation marks omitted). *Richie* pointed to the American Bar Association's Defense Function Standards, which provide that "whether and how to conduct cross-examination" is a strategic and tactical decision to be made by counsel. American Bar Association, *Standards for Criminal Justice—Prosecution Function and Defense Function*, Standard 4–5.2 (3d ed. 1993).

The difference between Hengst's testimonies was not dramatic; both supported Higa's position that the child was not alive when thrown. Thus, trial counsel's apparent decision not to question Hengst about his prior description that the child was "limp" while being thrown was a strategic decision, which will not be second-guessed. *Richie*, 88 Hawai'i at 39–40, 960 P.2d at 1247–48. Ac-

cord *State v. Terlep*, No. 29624, 2010 WL 3638836, at * 7 (App. Sept. 21, 2010) (mem. op.) (refusing to review an attorney's decision to object rather than cross-examine a witness).

As to the second subject of testimony, Higa's argument that trial counsel erred by not producing testimony that there were ten to twenty minutes between the last time the child was seen alive and the time the first calls to police dispatch regarding the child on the highway, evidence of that lapse of time was presented at trial. Officer Jones testified that he saw the child in the middle of the street around 11:15 a.m. and returned the child to Shane Mizusawa (Mizusawa), the child's mother's boyfriend. Hengst testified that at approximately 11:30 to 11:40 a.m., he was outside his apartment when he saw Higa walk by. Moreover, the State acknowledged this interval in its closing statements. There is no basis for concluding that Oyama failed to use "critical grand jury testimony" about the interval between the child's last known whereabouts and his being thrown, much less that this "failure" amounted to ineffective assistance of counsel.

 Higa also alleges Oyama erred in eliciting testimony from Nancy Chanco, the child's mother, that she and Mizusawa were at Ala Moana during the time that the child died, which he claims cast suspicion back on Higa. Higa's theory is apparently that by doing so, Oyama diverted suspicion from Mizusawa, whom Oyama implied killed the child before Higa, undisputedly, threw him from the overpass. Given that there was some tactical decision made to call Chanco to testify,[11] it is not for this court to second-guess Oyama's decisions on how to question her. *See Richie*, 88 Hawai'i at 39–40, 960 P.2d at 1247–48. Accordingly, we do not find that counsel was ineffective based on his choice of questions to ask witnesses nor his choice of which witnesses to call.

---

11. Oyama attempted to elicit testimony from Chanco that she had said on television following the child's death that a traffic camera filmed the child, already dead, falling through the air and that the medical examiner told her the child was dead pre-fall. However, the State's hearsay objections were sustained. Further, Oyama said he

"intend[ed] to show that basically there is no freeway camera, that the medical examiner did not tell her that this happened. So I'm thinking that she may have gotten the information from somewhere else, perhaps, the person she was with all day."

3. **Trial counsel was not ineffective for not moving to dismiss indictment because such a motion was not potentially meritorious.**

In his point of error, Higa argues that his trial counsel erred by not moving to dismiss the indictment on the basis of "police misconduct and failure to present exculpatory evidence to the grand jurors, with respect to withholding witness observations of the baby's condition from the medical examiner." Higa does not provide any argument on this point in the argument section of his Opening Brief; the argument section restates the point of error. Where the opening brief does not include "argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on" the "[p]oints not argued may be deemed waived." HRAP 28(b)(7); *Hawaii Ventures, LLC v. Otaka, Inc.*, 114 Hawai'i 438, 478–79, 164 P.3d 696, 736–37 (2007).

█ Even if we were to address this point, we could conclude that Oyama's failure to move to dismiss the indictment did not result "in either the withdrawal or substantial impairment of a potentially meritorious defense" as there is no basis upon which such a motion could be granted.

There are several accepted bases for granting a motion to dismiss indictment, *see, e.g.,* Hawai'i Rules of Penal Procedure (HRPP) Rule 6(b)(2) (objections to the grand jury array or qualification of individual grand juror); *State v. Jendrusch*, 58 Haw. 279, 281, 567 P.2d 1242, 1244 (1977) (deficiencies in the charge); *State v. Chong*, 86 Hawai'i 282, 289, 949 P.2d 122, 129 (1997) ("prosecutorial misconduct or other circumstances which prevent the exercise of fairness and impartiality by the grand jury"). However, the appellate courts are reluctant to overturn indictments. *See State v. Chong*, 86 Hawai'i 290, 298, 949 P.2d 130, 138 (App.1997); *see also State v. Pulawa*, 62 Haw. 209, 218, 614 P.2d 373, 378 (1980) ("an indictment should only be quashed on the clearest and plainest grounds"). Higa does not contend that the indictment was facially invalid or that the grand jury was improperly impaneled.

█ Higa's argument implies that there was police misconduct where "witness observations of the baby's condition" was withheld from the medical examiner and the grand jurors. Higa does not cite any authority to support the proposition that the police have an affirmative duty to provide the medical examiner *any* information obtained in an investigation, much less all eyewitness observations gathered prior to the autopsy. *But see Rollins v. State*, 161 Md.App. 34, 866 A.2d 926, 955 (Md.Ct.Spec.App.2005) ("it is entirely appropriate for the medical examiner to gather information [from police] regarding the circumstances surrounding the demise of a decedent"). Thus the "police misconduct" allegation is without merit.

The argument that the grand jurors were not provided with observations of the child's condition is similarly without merit. Higa's Opening Brief establishes that the description of the child most favorable to his theory of the case was the description of the child as being "limp." As noted above, Hengst gave this description to the grand jury. Higa does not cite another witness observation, known to police and prosecutors at the time the grand jury convened, that was withheld.

█ Furthermore, the prosecution is "required only to present to the grand jury evidence which is clearly exculpatory in nature." *State v. Bell*, 60 Haw. 241, 242, 589 P.2d 517, 518 (1978) *overruled on other grounds by State v. Chong*, 86 Hawai'i 282, 949 P.2d 122 (1997). The eyewitnesses' observations of a "limp" body did not conclusively negate Higa's guilt and was not "clearly exculpatory." Thus, even if the prosecutors had withheld this observation, it would not be misconduct.

Higa has failed to meet his burden and thus his ineffective assistance of counsel claims are without merit. *Richie*, 88 Hawai'i at 45, 960 P.2d at 1253.

### III. Conclusion

The May 5, 2010 Judgment of Conviction and Sentence of the Circuit Court of the First Circuit is affirmed.